UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DWIGHT SMITH, CATHERINE
SMITH, and BRYANT SMITH,

       Plaintiffs,

       v.

CITY OF JOHNS CREEK, et al.,

       Defendants.

CIVIL ACTION NO.

1:24-CV-1163-SEG

## MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' motion for partial summary judgment with respect to their Fourth Amendment unlawful seizure and excessive force claims against Defendant James Tait (Doc 40), and Defendant Tait's cross-motion for summary judgment on all claims asserted against him (Doc. 44.)   After careful consideration, the Court enters the following memorandum opinion.

## I.    Factual Background[1]

This case stems from a 911 call about an errant and yappy chihuahua. The 911 caller was Mandy Rahjans, a neighbor with whom Plaintiffs have previously had many disputes.[2]  (Rahjans 911 Call, Doc. 40-18.)  On the call, Ms. Rahjans pleaded with police to "come quick" because Plaintiffs' dog was "trying to attack" her and had previously bitten her sister.  (*Id.*)

### A. Officer Ehrenreich's Response to the 911 Call

At approximately 8:02 AM on April 19, 2021, Officer Eric Ehrenreich arrived at a cul-de-sac outside of Plaintiffs' residence at 480 Leasingham Way in Duluth, Georgia.  (Ehrenreich Body-worn Camera ("BWC"), Doc. 40-12 at

---

[1] The facts in this section are drawn from the parties' statements of material fact, *see* LR 56.1(B), NDGa., and, as necessary, from the underlying record. The Court has viewed the evidence and drawn all factual inferences in the light most favorable to the nonmoving parties.  *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).  If the Court includes a proposed fact to which an objection was asserted, but there is no discussion of the objection, then the parties may assume that the Court considered and rejected it.

[2] *See, e.g., Smith v. Lifeline Animal Project, Inc.*, No. 1:22-CV-2325-SEG, 2024 WL 1243022 (N.D. Ga. Feb. 16, 2024), *aff'd sub nom. Smith v. City of Johns Creek*, No. 24-10815, 2025 WL 313165 (11th Cir. Jan. 28, 2025); *Smith v. Fulton Cnty.*, No. 1:22-CV-2471-SEG, 2023 WL 10325341 (N.D. Ga. Mar. 7, 2023), *reconsideration denied in part sub nom. Smith v. Lall*, No. 1:22-CV-2471-SEG, 2024 WL 1007424 (N.D. Ga. Feb. 20, 2024); *Devlin Rajhans v. Smith*, No. 24-cv-197-SEG (N.D. Ga.); *Mandeep Rajhans v. Smith*, No. 1:23-cv-3250-SEG (N.D. Ga.); *Devlin Rajhans v. Smith*, No. 1:23-cv-3251-SEG (N.D. Ga.); *Mandeep Rajhans v. Smith*, No. 1:23-cv-4889-SEG (N.D. Ga.).

08:02:30-08:02:50.)[3]   Upon exiting his police vehicle, Officer Ehrenreich encountered an unidentified man who told him that the 911 caller had just left. (*Id.* at 08:02:45-08:03:05.)   He also observed, in his words, "a 5-pound chihuahua." (*Id.*)  Seeing humor in the situation, Officer Ehrenreich asked, "Is that the dangerous dog that's out here ravaging people?" (*Id.*)   Officer Ehrenreich then spoke to an elderly woman at the house adjacent to Plaintiffs' who appeared to be related to the 911 caller.  (*Id.* at 08:03:15-08:04:00.)  She indicated that the chihuahua was on their property and had tried to bite her daughter, the 911 caller.  (*Id.*)  She also noted that the chihuahua belonged to their neighbors, pointing to the Plaintiffs' residence.  (*Id.*)

Officer Ehrenreich then began walking towards Plaintiffs' backyard in an attempt to encourage the chihuahua to move there.  (*Id.* at 08:04:00-08:04:30.)  He briefly entered the Plaintiffs' unfenced backyard via the side of

---

[3] In citing the body-worn camera ("BWC") footage submitted by the parties, the Court refers to the timestamp in the top-right corner of the BWC footage.  This timestamp is formatted using the "ISO 8601" standard as follows: YYYY-MM-DD HH:MM:SS.  *See* Timestamp watermark for camera videos - Axon Evidence product guide, https://my.axon.com/s/article/Timestamp-watermark-for-camera-videos-Axon-Evidence-product-guide?language=en_US (last accessed March 25, 2026).  The "-0400" that appears at the end of the timestamp indicates that the time being displayed is 4 hours before Coordinated Universal Time ("UTC"), which corresponds with Eastern Standard Time ("EST").  Thus, the timestamp "2021-04-19 08:15:25 -0400" indicates 25 seconds after 8:15 AM EST on April 19, 2021.

their house while repeatedly instructing the chihuahua to "get back home." (*Id.*)  The chihuahua appeared to follow, albeit while barking in protest, Officer Ehrenreich's directions.  (*Id.*)  Officer Ehrenreich then moved to the front of the house and knocked on Plaintiffs' front door and rang the doorbell.  (*Id.* at 08:04:25-08:06:05.)  After hearing no answer for about a minute-and-a-half, Officer Ehrenreich made his way back to Plaintiffs' backyard.  (*Id.* at 08:06:00-08:07:00.)

As he entered Plaintiffs' backyard, he repeatedly announced his presence as "Johns Creek Police" and encountered the chihuahua again.  (*Id.* at 08:06:50-08:07:25.)  This time, Officer Ehrenreich encouraged the chihuahua to go up an outdoor staircase that appeared to be connected to a backyard deck or patio.  (*Id.*)  While at the foot of the staircase, Officer Ehrenreich, presumably seeing Plaintiff Catherine Smith ("Mrs. Smith") on the deck, called out "Hey Ma'am, is this your chihuahua?"  (*Id.* at 08:07:15-08:07:25.)  Neither the back deck nor Plaintiffs are visible in Officer Ehrenreich's BWC footage; the viewer can only see the foot of the outdoor staircase.  Mrs. Smith responded to Officer Ehrenreich by repeatedly insisting that he "get off the property."  (*Id.* at 08:07:20-08:07:30.)  Officer Ehrenreich asked again whether the chihuahua belonged to Mrs. Smith, and then urged, "Get your dog! Your neighbors are calling."  (*Id.*)  Then, within about 10 seconds of the interaction beginning, a

noise is heard from the back deck. (*Id.* at 08:07:25-08:07:35.) Mrs. Smith can also be heard saying, "Don't go there!" (*Id.*)

Officer Ehrenreich then immediately fled Plaintiffs' backyard and returned to his parked police vehicle. (*Id.* at 08:07:30-08:07:55.) As he ran, he sent the following radio transmission: "Start me another unit. The residents are coming out to attack me! Get units here now!" (*Id.*) Officer Ehrenreich proceeded to reposition his vehicle in the cul-de-sac such that it was pointing towards Plaintiffs' house at a slight angle. (*Id.* at 08:07:50-08:08:30.) He also obtained a rifle from his vehicle and held it at a "low ready" position. (*Id.*) Officer Ehrenreich continued sending a series of radio transmissions, indicating that he encountered a Black male and Hispanic female behind the house and that they "came out trying to attack him." (*Id.* at 08:08:25-08:09:30; *see* Pls' SMF, Doc. 40-2 ¶ 3; Def's Resp. to Pls' SMF, Doc. 43 ¶ 3.) He also noted on the radio that "no crime ha[d] been committed." (*Id.*) He later relayed that he saw the male briefly come out of the front door and then go back inside the house. (Ehrenreich BWC, Doc. 40-12 at 08:08:25-08:09:30.) Officer Ehrenreich then repeatedly shouted for the residents of 480 Leasingham Way, Plaintiffs' home, to come out with their hands up. (*Id.* at 08:09:30-08:11:20.)

### B. Officer Tait's and Others' Response to Officer Ehrenreich's Call for Assistance

At approximately 8:08 am, Officer Tait heard Officer Ehrenreich yell over the radio that the residents of the Smiths' home were attempting to attack him. (Def's SMF, Doc. 44-2 ¶ 1; Pls' Resp. to Def's SMF, Doc. 50 ¶ 1.) Based on the radio transmission, Officer Tait believed that multiple people had assaulted Officer Ehrenreich. (Doc. 44-1 ¶ 2; Doc. 50 ¶ 2.) Several police officers, including Officer Tait, responded to Officer Ehrenreich's call for assistance and parked their vehicles on the road outside of Plaintiffs' residence. (Doc. 44-1 ¶ 3; Doc. 50 ¶ 3.) At least one of the responding officers drew his handgun and held it at the low ready position as he approached the scene. (Ehrenreich BWC, Doc. 40-12 at 08:11:15-08:11:45.) Officer Ehrenreich was also holding his rifle at the time. (*Id.*)

Because the Public Address system ("PA system") on Officer Ehrenreich's vehicle was not working, Officer Tait began using his vehicle's PA system (or "bullhorn") to issue verbal commands to Plaintiffs who were inside their residence. (Doc. 44-1 ¶ 4; Doc. 50 ¶ 4.) Within approximately a minute of arriving on the scene, Officer Tait made the following announcement on his PA system directed towards Plaintiffs' home: "This is the Johns Creek Police. Everyone inside the house is under arrest. Come out with your hands up

6

immediately." (Doc. 44-1 ¶ 5; Doc. 50 ¶ 5; Tait BWC, Doc. 40-13 at 08:15:25-08:15:40.) A few seconds later, Officer Tait again announced over the bullhorn: "This is the Johns Creek Police. Everyone inside the home is under arrest. Come out with your hands up now." (Doc. 44-1 ¶ 6; Doc. 50 ¶ 6; Tait BWC, Doc. 40-13 at 08:15:40-08:15:50.) Upon receiving a radio transmission from a dispatcher indicating she was on the phone with Plaintiffs, Officer Tait instructed the dispatcher to advise Plaintiffs to come out with their hands up and that they were under arrest. (Doc. 44-1 ¶ 7; Doc. 50 ¶ 7; Tait BWC, Doc. 40-13 at 08:15:50-08:16:00.)

Over the next seven minutes, from 8:16 AM to 8:23 AM, Officer Tait made approximately thirteen more announcements over the PA system demanding that Plaintiffs come out of their house with their hands up. (Doc. 44-1 ¶¶ 8-11, 14-16, 18; Doc. 50 ¶¶ 8-11, 14-16, 18; Tait BWC, Doc. 40-13 at 08:16:10-08:22:50.) He also repeatedly declared that Plaintiffs were under arrest. (*Id.*) Plaintiffs did not exit their home during this seven-minute period. (Doc. 44-1 ¶ 19; Doc. 50 ¶ 19.) Instead, Mrs. Smith, who was on the phone with a 911 operator, informed the operator that she was getting dressed and would come outside in a couple of minutes. (Doc. 44-1 ¶ 13; Doc. 50 ¶ 13.) At approximately 8:17 AM and 30 seconds, a dispatcher radioed officers to relay

this information.  (Tait BWC, Doc. 40-13 at 08:17:30-08:17:40.)  Plaintiffs, however, would not emerge from their house until much later.

### C. Plaintiffs' Calls to 911

Plaintiffs have submitted recordings of two calls they had with 911 operators during the incident.  (Doc. 40-19; Doc. 40-20.)  The parties do not clearly indicate at what time these 911 calls occurred, although from context, the Court gathers that they took place near the beginning of the encounter. Like the officers on scene, the 911 operators instructed Plaintiffs to come out of their home with their hands up. (*Id.*)  They also represented that if Plaintiffs did not come out with their hands up that police officers would enter their house and arrest them.  (*Id.*)  For instance, on the first call, the 911 operator told Mrs. Smith, "The officers are saying come out with your hands up and if they have to come in, they will be arresting."  (Doc. 40-19.)  Mrs. Smith responded that she would come out in a few minutes after she finished getting dressed. (*Id.*)  Mrs. Smith then told the 911 operator that she wanted an officer to call her.  The operator acknowledged the request and noted that she provided the officers with Mrs. Smith's number.  (*Id.*)

The second recording begins with Plaintiff Dwight Smith ("Mr. Smith") protesting to another 911 operator that there was "a SWAT team" outside of his house.  (Doc. 40-20; Doc. 40-2 ¶ 15; Doc. 43 ¶ 15.)  The 911 operator

8

responded that he needed to "step out with his hands up." (Doc. 40-20.) Like Mrs. Smith, Mr. Smith asked for an officer to call Plaintiffs. (*Id.*) When asked why the police wanted Plaintiffs to come out with their hands up, the 911 operator indicated that he wasn't familiar with the entire incident but stated that it was a "lawful order" and that "if they have to come in, everyone is going to be arrested." (*Id.*) Mrs. Smith then got on the line. (*Id.*) The 911 operator repeatedly instructed Mrs. Smith that Plaintiffs needed to come out with their hands up and that if the officers needed to enter the house, Plaintiffs would all be arrested. (*Id.*) The call ended with the 911 operator telling Mrs. Smith that he needed to hang up so that Sergeant Derrick Wilson, who was a "commander," could call Mrs. Smith. (*Id.*)

### D. Plaintiffs' Calls with Officer Tait and Sergeant Wilson

Back at the scene outside of the house, after conferring with Sergeant Wilson—who appeared to have taken command of the police response to the incident—Officer Tait called Mrs. Smith on a cell phone at approximately 8:27 AM.[4] (Doc. 44-1 ¶ 21; Doc. 50 ¶ 21; Tait BWC, Doc. 40-13 at 08:26:40-08:26:50.) Officer Tait began the conversation by stating, "Hey, this is Officer Tait with

---

[4] Audio from a portion of the conversation between Sergeant Wilson and Officer Tait, from approximately 8:25 AM and 30 seconds to 8:26 AM and 40 seconds, appears to be redacted. (Officer Tait BWC, Doc. 40-13 at 08:25:30-08:26:40.)

Johns Creek Police. What's going on today?" (Tait BWC, Doc. 40-13 at 08:26:45-08:26:50.) At this point, the phone call was not on speaker phone, so the BWC footage does not reveal what Mrs. Smith is saying. (*Id.* at 08:26:45-08:27:30.) However, Officer Tait put his phone on speaker roughly one minute into the phone call. (*Id.* at 08:27:30-08:27:35.)

The phone call lasted approximately eighteen minutes and contained many exchanges that are not material to the resolution of the parties' motions. The Court does not attempt to transcribe every detail of the phone call but describes relevant portions. Near the beginning of the phone call, Officer Tait told Mrs. Smith: "We need to get your side of the story, but what you need to do is you need to come out safely. I'm a negotiator okay, that's my primary goal . . . is I need y'all to come out of the house safely. Okay. Well tell me what happened." (*Id.* at 08:27:10-08:27:30.) Mrs. Smith then described the morning's events from her perspective:

> I, my son, we heard the dog barking and we realized our dog had escaped the back deck. So my son went to get the dog. And I told him, you know you need to get back, I'll get the dog. He says, the dog's loose. As I start to head down to call the dog, I see a police officer underneath my deck. And he pops out from underneath the deck. And he says to me, is this your dog? Is this your dog? And I get really shocked and surprised. And I think he's going to take our dog. . . . This is how this whole incident started with a chihuahua . . . .

10

(*Id.* at 08:27:35-08:28:15.)  Mrs. Smith proceeded to describe the alleged details of previous disputes with her neighbors involving the chihuahua, as well as incidents involving Johns Creek Police and animal control.  (*Id.* at 08:27:35-08:30:20.)

During the call, Officer Tait asserted that "the reason so many officers are out here is because you charged, your family charged an officer when he was coming to knock on your front door."  (*Id.* at 08:30:20-08:30:30; Doc. 44-1 ¶ 23; Doc. 50 ¶ 23.)  Mrs. Smith strenuously objected to that assertion, stating that she never charged an officer and never left the door area of her back deck.  (Tait BWC, Doc. 40-13 at 08:30:25-08:31:30.)  She told Officer Tait that she instructed the responding officer (Officer Ehrenreich) to get off the property because she was afraid he was going to take her dog.  (*Id.*)  She further noted that she observed the same officer point a gun at her as she attempted to video record the officer from her window.  (*Id.*)

At approximately 8:43 AM, Sergeant Wilson, upon hearing that Mrs. Smith appeared to be under the impression that she was going to be arrested, began speaking with Mrs. Smith on Officer Tait's phone.  They had the following exchange:

> Mrs. Smith: So she [the neighbor] will be arrested at the same time I will be arrested?

Sergeant Wilson: Ma'am. Ma'am. This is Sergeant Wilson with John's Creek Police.

Mrs. Smith: Yes.

Sergeant Wilson: Are you willing to come to the steps and sit down on your front steps and talk to me?  We're not talking about arresting anyone. I'm not trying to arrest anyone. I want to talk to you and try to resolve . . . .

. . .

Sergeant Wilson: Can I talk? I'm not trying to arrest anyone. I just want to speak to you so we can try to resolve some of the issues that are going on out here.

Mrs. Smith: Okay. Okay, so you're saying on video right now that I am not charged with anything?

Sergeant Wilson: Exactly. I'm saying, I'm not interested in arresting anyone. I want to sit down and talk to you to try to resolve whatever issues you have, whatever issues your neighbor may have. You guys live out here together. You're in a neighborhood. We want to resolve issues. I'm not interested in arresting anyone. I just want to sit down and talk to you.

Mrs. Smith: So there are no charges on me right now.

Sergeant Wilson: Correct. Yes, Ma'am. I just want to talk to you.

Mrs. Smith: I need John's Creek . . . I need the chief of police to call me. Okay, and I'm going to be out in 10 minutes. I'm going to go ahead and clean myself up and I will be outside, or officers can come in, in 10 minutes. . . . .

Sergeant Wilson: I will sit down on the front porch and talk to you.

Mrs. Smith: Okay. Call me back in 10 minutes. I'm going to clean myself up and then . . . we'll resolve it.

12

Sergeant Wilson: Yes Ma'am.

Mrs. Smith: Call me in exactly 10 minutes and then we'll resolve it. Goodbye.

Sergeant Wilson: Yes Ma'am.

(Tait BWC, Doc. 40-13 at 08:43:20-08:45:10.)

At approximately 8:55 AM, the officers called Mrs. Smith again. The following exchange ensued:

Mrs. Smith: Hello.

Sergeant Wilson: Yes Ma'am. It's Sergeant Wilson. Are you ready?

Mrs. Smith: I need about two more minutes and then I'll be out there with my dog.

Sergeant Wilson: Okay. So when you're ready come on out. I'll meet you on the front porch.

Mrs. Smith: And then I'm leaving for work. I'm not even sure if I want to talk to you now.

Sergeant Wilson: So are you interested in resolving the issues?

Mrs. Smith: Are you going to come inside of the house?

Sergeant Wilson: I don't have to come inside of the house. I can meet you on the porch.

Mrs. Smith: I was threatened 8 times that they were going to bring a SWAT team in here.

Sergeant Wilson: Ma'am. No one is coming in your house. I'm asking you to meet me on the front porch.

13

Mrs. Smith: That's what they told me.

Sergeant Wilson: I'm telling you! Listen to me! I'm telling you! I'm the one [who's] gonna talk to you.

Mrs. Smith: Okay, I understand that.

Sergeant Wilson: Thank you.

Mrs. Smith: Now can I speak? I was told and threatened that they were going to come inside my house.

Sergeant Wilson: And who were you told that by?

Mrs. Smith: By the other two people that called before. . . . They had a microphone and they were saying that, come out the house with your hands up. Okay. That's the last 3 calls I've gotten for the last 45 minutes is if I do not . . .

Sergeant Wilson: I'm standing in front of your house, can I tell you what's going on now? No one is . . .

Mrs. Smith: I know what's going on. You guys fucked up. . . . Leave the area now. Goodbye. If you're not going to come in the house, you need to leave. We need to dismantle this. You guys overreacted yet again. You surrounded my house. You threatened that you would come inside of my house and arrest all three people in here. You put your face in your ass again. Okay. So, you can leave now so I can file my suit against all of you, and write complaints against all of you, and have every single one of you fired. I'm going to be heading over to Johns Creek Police Station in about 30 minutes they can talk to me there. I'm getting ready to leave now, in fact. I'm just going to leave. Outside the house. I'm going to pull my car out in about three minutes. Okay? I'll be out there in 3 minutes. Goodbye.

(Tait BWC, Doc. 40-13 at 08:54:55-08:57:00.)

### E. Plaintiffs' Exit from Their Home

At approximately 8:58 AM, Plaintiffs Catherine Smith and Dwight Smith exited the front of their home and came out onto the driveway, where a white minivan was parked. (Ehrenreich BWC, Doc. 40-12 at 08:58:40-08:59:30; Wilson BWC Part 2, Doc. 40-15 at 08:59:00-08:59:30.) As they exited their home, Mrs. Smith had her hands up while Mr. Smith did not. (*Id.*) Officer Tait and Sergeant Wilson walked onto the driveway to talk to Plaintiffs, as Officer Ehrenreich stood behind them. (*Id.*) As he approached Plaintiffs, Officer Tait held out his hands and said, "I'm relaxed I've got my hands free. Can we talk next to the vehicle?" (*Id.*) Plaintiffs' response is inaudible in the BWC footage.[5] It also appears that Officer Tait told Mrs. Smith that she didn't have to put her hands up, but she refused, stating "I'm not going to put my hands down. I was told that a SWAT team was going to come inside my house." (*Id.*) There is no indication that any of the officers were brandishing weapons as they spoke to Mrs. Smith. Officer Tait attempted to speak about the incident with Plaintiffs, but Mrs. Smith responded "No, you're not going to explain anything to us." (Ehrenreich BWC, Doc. 40-12 at 08:59:20-08:59:30; Wilson BWC Part 2, Doc. 40-15 at 08:59:20-08:59:30.)

---

[5] The BWC footage provided for Officer Tait does not extend to this portion of the incident. (Doc. 40-13.)

Mrs. Smith then demanded, "if you're not arresting me, move your cars so I can drive out. Move your vehicles, you're blocking me from getting out of my garage." (Ehrenreich BWC, Doc. 40-12 at 08:59:25-08:59:35; Wilson BWC Part 2, Doc. 40-15 at 08:59:25-08:59:35.) At that juncture, Officer Tait walked off the driveway and back towards the police vehicles parked in the cul-de-sac. (Ehrenreich BWC, Doc. 40-12 at 08:59:35-08:59:45; Wilson BWC Part 2, Doc. 40-15 at 08:59:35-08:59:45.) In total, Officer Tait stood on Plaintiffs' driveway for approximately 30 seconds before leaving in response to Mrs. Smith's demand that the officers move their cars. (Ehrenreich BWC, Doc. 40-12 at 08:59:15-08:59:45.)

Mrs. Smith continued talking to Sergeant Wilson about her disputes with her neighbors and Johns Creek Police's failure to investigate her neighbors. (Ehrenreich BWC, Doc. 40-12 at 08:59:35-09:00:15; Wilson BWC Part 2, Doc. 40-15 at 08:59:35-09:00:15.) Within approximately one minute of Mrs. Smith's demand that the officers move their cars, Sergeant Wilson also began walking back to the police vehicles parked on the road. (Ehrenreich BWC, Doc. 40-12 at 09:00:10-09:00:20.) Another police official, who identified himself as Major Clifton, attempted to speak with Mrs. Smith from the edge of the driveway. (*Id.* at 09:00:20-09:00:55; Wilson BWC Part 2, Doc. 40-15 at 09:00:20-09:00:55.) Mrs. Smith refused to speak with him and insisted again

16

that the officers leave. (*Id.*) He, too, then walked toward the police vehicles parked on the road. (Ehrenreich BWC, Doc. 40-12 at 09:00:45-09:00:55; Wilson BWC Part 2, Doc. 40-15 at 09:00:45-09:00:55.)

After briefly conferring among themselves, at approximately 9:02 AM, the officers got in their vehicles and begin driving away. (Doc. 44-1 ¶ 41; Doc. 50 ¶ 41; Ehrenreich BWC, Doc. 40-12 at 09:01:30-09:02:30; Wilson BWC Part 2, Doc. 40-15 at 09:01:30-09:02:12.) During the incident, Officer Tait did not make any physical contact with Plaintiffs or apply any physical force to the Plaintiffs. (Doc. 44-1 ¶ 40; Doc. 50 ¶ 40.) None of the Plaintiffs were arrested or charged as a result of the incident. (Doc. 44-1 ¶ 42; Doc. 50 ¶ 42.)

## II. Procedural Background

The procedural background of this case is set forth in detail in the Court's previous orders. (Doc. 26 at 1-4; Doc. 70 at 1-7.) On March 19, 2024, Plaintiffs filed this § 1983 renewal action against the City of Johns Creek (the "City") and several Johns Creek law enforcement officers, including Officer Tait. Plaintiffs' second amended complaint brings seven claims against Officer Tait: (1) unlawful search and seizure in violation of the Fourth Amendment (via 42 U.S.C. § 1983); (2) excessive force in violation of the Fourth Amendment (via 42 U.S.C. § 1983); (3) First Amendment retaliation (via 42 U.S.C. § 1983); (4) failure to intervene (via 42 U.S.C. § 1983); (5) civil conspiracy (via 42 U.S.C. §§

17

1983, 1985, 1986); (6) trespass (under Georgia law); and (7) assault (under Georgia law).  (Doc. 28 ¶¶ 197-273.)

On July 14, 2025, Plaintiffs moved for partial summary judgment with respect to their Fourth Amendment unlawful seizure and excessive force claims against Defendant Tait.  (Doc. 40.)  On August 4, 2025, Defendant Tait responded to Plaintiffs' motion for partial summary judgment with a cross-motion for summary judgment on *all claims* asserted against him in the second amended complaint.  (Doc. 44.)  The motions are fully briefed and ripe for resolution.[6]

---

[6] The Court observes that Plaintiffs filed their motion for partial summary judgment before the parties filed their joint preliminary report and discovery plan. (Doc. 40.)  In turn, Defendants responded by filing their cross-motion for summary judgment before the discovery period had elapsed. (Doc. 44.)  The parties do not request that the Court defer adjudicating their summary judgment motions pending further discovery under Federal Rule of Civil Procedure 56(d) or object to the Court resolving their motions on the current record, which includes extensive body camera footage submitted by Plaintiffs. Further, the Court considers that it must resolve questions of qualified immunity "at the earliest possible stage in litigation." *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1334 (11th Cir. 2025).  The Eleventh Circuit has indicated that, when a defendant asserts the defense of qualified immunity on summary judgment, the district court cannot reserve its ruling solely on the ground that discovery has not taken place. *See Huntley v. Hillsborough Cnty. Sheriff's Off.*, No. 25-12102, 2026 WL 21442, at *1 (11th Cir. Jan. 5, 2026) (vacating a district court's holding that a motion for summary judgment raising qualified immunity was "premature" because it was "filed before discovery ha[d] taken place").  Of course, had Plaintiffs argued that consideration of summary judgment should be deferred or denied under Rule 56(d), which provides for the deferral or denial of a motion for summary

## III.  Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary

---

judgment when essential facts are unavailable to the nonmovant, the Court would have considered that argument.  Plaintiffs, however, have not made that contention here.  To the contrary, they have also affirmatively moved for summary judgment.  (Doc. 40.)

judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir. 1999). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson*, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246.

Where, as here, the record contains reliable video capturing the events in question, the district court should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

## IV.    Discussion

The Court first considers Defendant Tait's motion for summary judgment (Doc. 44) because it resolves all the claims that Plaintiffs have asserted against him.  In ruling on Defendant's motion, the Court considers both the arguments that Plaintiffs' advance in their own motion for partial summary judgment (Doc. 40), and those set forth in Plaintiffs' response to Defendant's motion (Doc. 48.)  Defendant Tait seeks summary judgment on the ground that he is entitled to qualified immunity on Plaintiffs' constitutional claims and official immunity on Plaintiffs' state law claims.  (Doc. 44.)

Qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

21

To receive qualified immunity, a government official "must initially establish that he was acting within his discretionary authority when the alleged wrongful acts occurred." *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022). If he does so, "the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Id.* The plaintiff must show that: (1) "the official's alleged conduct violated a constitutionally protected right[,]" and (2) "the right was clearly established at the time of the misconduct." *Id.*

Plaintiffs appear to concede that Officer Tait was acting within his discretionary authority when he responded to Officer Ehrenreich's call for assistance on April 19, 2021.[7] Accordingly, with respect to each claim asserted by Plaintiffs, a two-part inquiry applies to evaluate whether Plaintiffs have met their burden to show that qualified immunity is unwarranted. First, the

---

[7] Plaintiffs allege that Officer Tait "is a law enforcement officer for the City of Johns Creek and was acting under the color of the law in the course and scope of his employment" during the events that are the subject of this suit. (Doc. 28 ¶ 11.) Moreover, Plaintiffs' response to Officer Tait's motion for summary judgment did not advance any argument challenging the discretionary authority requirement. *See Johns v. CSX Transportation, Inc.*, 210 F. Supp. 3d 1357, 1373 (M.D. Ga. 2016) ("When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims."). The Court finds that Officer Tait was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize" when he responded to Officer Ehrenreich's call for assistance. *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004).

Court "consider[s] whether, taken in the light most favorable to [Plaintiffs], the facts alleged show [Officer Tait's] conduct violated a constitutional right." *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016).  Second, "[i]f a constitutional right would have been violated under the *plaintiff's* version of the facts," the Court "must then determine 'whether the right was clearly established.'" *Ferraro*, 284 F.3d at 1194 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by*, *Pearson v. Callahan*, 555 U.S. 223 (2009)).

### A. Unlawful Seizure (Count 1)

Pursuant to 42 U.S.C. § 1983, Plaintiffs bring a claim of unlawful seizure in violation of the Fourth Amendment against Officer Tait.  (Doc. 28 ¶¶ 198-211.)  The parties do not dispute that when Officer Tait arrived on the scene, he repeatedly announced, over his car's PA system, that Plaintiffs were "under arrest" and ordered them to come out of their home with their hands up. Plaintiffs contend that Officer Tait's announcements constituted a seizure, which violated the Fourth Amendment.  (Doc. 40-1 at 4-14; Doc. 48 at 3-15.) Officer Tait does not argue that he had a warrant, probable cause, or other authority permitting him to seize Plaintiffs.  Instead, he contends that his commands did not amount to a seizure because Plaintiffs did not submit to them.  (Doc. 44-1 at 5-10.)  Further, Officer Tait claims that even if Plaintiffs

are able to show a constitutional violation, there is no law clearly establishing a Fourth Amendment violation "when an officer who is not physically present on the plaintiffs' property, including the curtilage, verbally commands them to exit their home for the purpose of arrest, later retracts the arrest, and instead seeks a conversation to resolve the issue, ultimately leaving the plaintiffs' residence without making any arrests or issuing any charges."  (Doc. 44-1 at 16-17.)

The Court first considers whether, under the novel circumstances presented by this case, Officer Tait seized Plaintiffs within the meaning of the Fourth Amendment.[8]  It then turns to the question of whether the law "clearly established" that Officer Tait's actions amounted to a seizure.

### 1.  Constitutional Violation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  A person has been subjected to a "seizure" within the meaning of the Fourth Amendment "when there is a governmental termination of freedom of movement *through means*

---

[8] As explained later in this memorandum opinion, the Court does not separately analyze the reasonableness of the seizure because (1) Officer Tait does not address the matter in his motion; and (2) qualified immunity protects Officer Tait, even assuming the seizure was unreasonable.

*intentionally applied.*"  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989).  Put another way, a Fourth Amendment seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J.)).

There are two ways in which a seizure can occur: (1) "a laying on of hands or application of physical force to restrain movement," *or* (2) where physical force is absent, "*submission* to the assertion of authority."  *Hodari D.*, 499 U.S. at 626; *see United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) ("The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority.").  Here, the BWC footage clearly shows that Officer Tait did not apply any physical force to Plaintiffs during the incident.  The Court therefore considers whether Officer Tait engaged in a show of authority and whether Plaintiffs submitted to that show of authority.

"[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  *Hodari*, 499 U.S. at 628; *see also Michigan v.*

25

*Chesternut*, 486 U.S. 567, 573-74 (1988) (observing that the Supreme Court has embraced the objective test laid out in Justice Stewart's opinion in *Mendenhall*). "Examples of circumstances that might indicate a seizure," include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (Stewart, J.); *see also United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (listing relevant factors such as "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police" (quotation omitted)).

Critically, "[u]nlike with a seizure by physical force, a seizure by a show of authority doesn't happen unless the subject *yields*" to that authority. *Watkins v. Davis*, 156 F.4th 1084, 1104 (11th Cir. 2025); *see Torres v. Madrid*, 592 U.S. 306, 322 (2021) ("Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement."). For instance, "[w]hen a suspect flees from the police, he is not submitting to their authority and therefore is not

seized." *Jordan*, 635 F.3d at 1186.  That is, "there is no seizure without *actual submission*; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (emphasis added).

Before delving into the analysis of whether Plaintiffs were seized, it is worth clarifying an element of the seizure inquiry as it applies to this case. When police approach an individual in a public place, "the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not *free to leave.*'" *Chesternut*, 486 U.S. at 573 (quoting *Mendenhall,* 446 U.S. at 554 (Stewart, J.)) (emphasis added).  However, the Supreme Court has explained that when a person "has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991).  For instance, "a passenger on a bus . . . scheduled to depart" might not feel "free to leave the bus even if the police had not been present."  *Id.* at 436.  In that situation, it "makes [little] sense to inquire whether a reasonable person would feel free to continue walking."  *Id.* at 435. Rather, where a person does not desire to leave, the more "appropriate inquiry is whether a reasonable person would feel *free to decline the officers' requests*

*or otherwise terminate the encounter.*" *Id.* at 436 (emphasis added); *see United States v. Drayton*, 536 U.S. 194, 202 (2002).

This principle applies with some force here, because Plaintiffs were not in a public place, but rather in their home. As such, they may have wished to simply go about their business at home. Moreover, as discussed below, Officer Tait and his fellow officers did not intend to prevent Plaintiffs from leaving their home. On the contrary, the officers expressly ordered Plaintiffs to *exit* their house. Given that context, the proper seizure inquiry is not whether a reasonable person in Plaintiffs' position would have felt "free to leave" their home. Rather, the appropriate inquiry is whether a reasonable person would have felt "free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. Put another way, the "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* at 437 (quoting *Chesternut,* 486 U.S. at 569); *see, e.g., United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (explaining, with respect to an alleged seizure of individual in a motel room, that the appropriate test for determining if a seizure occurred was whether "a reasonable person would not

28

have felt free to decline [the deputies'] requests to open the door or to otherwise ignore the deputies' presence").

With that clarification in mind, the Court turns to the seizure analysis at hand. The Court has little trouble concluding that Officer Tait, along with other officers who responded to the incident, engaged in a show of authority that would be sufficient to give rise to a seizure. When Officer Tait arrived on the scene, the Smiths' residence was surrounded by several police officers and their vehicles. The vehicles blocked off the cul-de-sac where Plaintiffs' home was located. Officer Ehrenreich was holding a rifle at the low ready position. Within approximately a minute of arriving, Officer Tait went on his police vehicle's PA system and announced, "This is the Johns Creek Police. Everyone inside the house is under arrest. Come out with your hands up immediately." (Doc. 44-1 ¶ 5; Doc. 50 ¶ 5; Officer Tait BWC, Doc. 40-13 at 08:15:25-08:15:40.) He then proceeded to repeat similar commands another fourteen times over a bullhorn. (Doc. 44-1 ¶¶ 8-11, 14-16, 18; Doc. 50 ¶¶ 8-11, 14-16, 18; Officer Tait BWC, Doc. 40-13 at 08:16:10-08:22:50.) When Plaintiffs called 911 to ask why police were surrounding their house, dispatchers instructed them to exit their residence and told them that police would enter their home if they did not. (Doc. 40-19; Doc. 40-20.)

29

Based on the language and tone of Officer Tait's commands, as well as the surrounding circumstances, Officer Tait engaged in a show of authority such that a reasonable person would have believed that they were required to comply by exiting the home with their hands up. *See Hodari D.*, 499 U.S. at 627-28. A reasonable person in Plaintiffs' situation would not "feel free to decline the [Officer Tait's] requests"—which were more in the nature of commands than requests—"or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436; *see, e.g.*, *United States v. Waterman*, 569 F.3d 144, 144-46 (3d Cir. 2009) (holding that a show of authority occurred when two uniformed police officers approached a house and commanded that people on the porch show their hands). Indeed, in briefing, Officer Tait candidly acknowledges that "a show of authority arguably occurred when Defendant Tait arrived on scene and announced plaintiffs' arrest[.]" (Doc. 44-1 at 8.)

But the seizure inquiry does not end with Officer Tait's show of authority. Plaintiffs must demonstrate that they "actually submitted" to Officer Tait's show of authority. *Brendlin*, 551 U.S. at 254. To the extent that Plaintiffs argue that they were seized when "officers unreasonably terminated the freedom of the Plaintiffs *while barricaded in their home*[,]" the Court respectfully disagrees. (Doc. 48 at 13 (emphasis added).) Because Officer Tait and other officers ordered Plaintiffs to come out of their home, for Plaintiffs to

30

be seized, they had to submit to the officers' show of authority by exiting the residence. That is, before they left their home, Plaintiffs did not yield to the officers' authority. *See, e.g.*, *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008) ("Here, appellant was not seized until he exited the house and complied with Officer Helthinstine's orders to hold his hands in the air. Before that, he had not submitted to any show of authority.").

The Eleventh Circuit's decision in *Menuel v. City of Atlanta* is instructive on this point. 25 F.3d 990 (11th Cir. 1994). In *Menuel*, officers responded to a 911 call at the home of Jessie Menuel, who appeared to be experiencing a mental health episode. *Id.* at 991. When the officers knocked on the front door, Ms. Menuel suddenly opened the door and lunged at the officers with a butcher knife. *Id.* at 992. Ms. Menuel then retreated into her father's bedroom and locked the door, barricading herself inside. *Id.* A reinforced contingent of police officers later surrounded the bedroom door and attempted to induce Ms. Menuel to leave the room and surrender. *Id.* When the officers eventually attempted to enter the bedroom, Ms. Menuel fired a handgun at them. *Id.* at 993. The officers returned fire, killing Ms. Menuel. *Id.*

Relevant here, the Eleventh Circuit considered whether Ms. Menuel was seized before the shooting during the period she was barricaded inside her room. The Court first acknowledged that Ms. Menuel "was surrounded by

31

overwhelming force and her capture was a mere eventuality, bound probably to occur only at a time and in a manner prescribed and implemented by the police." *Id.* at 995. Despite "her confinement and encirclement" in the bedroom, the Eleventh Circuit concluded that Ms. Menuel was not seized until she was shot "because she neither yielded to physical force (none was applied to her before the fatal shooting) nor submitted to a display of authority (much of which was applied before the shooting)[.]" *Id.*

Analogous to *Menuel*, during the period in which they refused to come out of their house, Plaintiffs were not seized notwithstanding police officers' "encirclement" of their home. *See, e.g., Ogletree v. Columbia Cnty.*, 34 F. Supp. 2d 1349, 1361 (M.D. Fla. 1997), *aff'd*, 146 F.3d 871 (11th Cir. 1998) (reasoning that a suspect surrounded by multiple police officers and confined to his backyard was not seized because he had not surrendered or submitted to officers' show of authority). For this reason alone, Plaintiff Bryant Smith cannot bring an unlawful seizure claim against Officer Tait. As Plaintiffs concede, he never complied with officers' requests to exit the house, instead opting to remain inside the residence throughout the incident. (Doc. 48 at 12.)

Plaintiffs Catherine Smith and Dwight Smith did, however, eventually come out of their house to speak with Officer Tait and other officers. The Court must therefore consider whether they were seized at this juncture. Although

the Eleventh Circuit does not appear to have evaluated a seizure under circumstances similar to those here, at least two other Courts of Appeals have.

For instance, in *Lundstrom v. Romero*, the plaintiff was told by a 911 dispatcher, following an encounter with police at his front door, that "I need you to go outside" and "[those are] real officer[s] out there and they are going to point their gun[s] at you if you refuse to come out." 616 F.3d 1108, 1117 (10th Cir. 2010). Several police officers were surrounding the plaintiff's residence. *Id.* The plaintiff testified that he then exited his home at gunpoint and was handcuffed by police. *Id.* at 1117-18. The Tenth Circuit determined that the plaintiff "was seized for purposes of the Fourth Amendment *when he complied* with the officers and dispatcher's orders to leave his house." *Id.* at 1123-24 (emphasis added).

The Sixth Circuit too has found that "when police position themselves outside a suspect's home and block the only exit, order a suspect to come outside, and the suspect does so, there has been a seizure." *Scozzari v. McGraw*, 500 F. App'x 421, 424 (6th Cir. 2012). In *United States v. Saari*, four police officers positioned themselves outside of a defendant's apartment. 272 F.3d 804, 806 (6th Cir. 2001). They knocked forcefully on the apartment door, identified themselves as police, and ordered the defendant out of his apartment. *Id.* at 807. The defendant then stepped out of the apartment. *Id.*

33

The *Saari* Court found that those circumstances constituted a seizure because the officers "summoned [the] [d]efendant to exit his home and acted with such a show of authority that Defendant reasonably believed he had no choice but to comply." *Id.* at 809.

Although the Eleventh Circuit's decision in *Menuel* did not address the same factual scenario, its reasoning is consistent with that of the Sixth and Tenth Circuits. The *Menuel* Court indicated that, by surrounding the bedroom in which Ms. Menuel was located, officers engaged in "the sort of encircling and impenetrable deployment of police compulsion" sufficient to constitute a show of authority. *Menuel*, 25 F.3d at 995. It was only because Ms. Menuel never "submitted to [that] display of authority[,]" that she was not seized before the shooting. *Id.* The converse is likely also true: Had Ms. Menuel peacefully surrendered to police in response to their encirclement of the bedroom, she would have then been seized for Fourth Amendment purposes. *Id.*

There are, however, several circumstances present here that render the seizure analysis particularly challenging. Although Mrs. and Mr. Smith *eventually* came out of their home during this incident, a significant period of time elapsed between Officer Tait's commands to leave the house and Plaintiffs' exit from the residence. BWC footage shows that Officer Tait issued his final command over the bullhorn for Plaintiffs to come out of their home at

8:23 AM.  (Tait BWC, Doc. 40-13 at 08:22:30-08:23:00.)  Further, during his first phone call with Mrs. Smith, at approximately 8:27 AM, Officer Tait indicated that "what you [Plaintiffs] need to do is you need to come out safely. I'm a negotiator okay, that's my primary goal . . . is I need y'all to come out of the house safely."  (*Id.* at 08:27:10-08:27:30.)  However, Plaintiffs only exited their home at approximately 8:58 AM, 35 minutes after Officer Tait's final bullhorn order and 30 minutes after his exhortation that he "need[ed]" Plaintiffs "to come out of the house safely."  (Ehrenreich BWC, Doc. 40-12 at 08:58:40-08:59:20; Wilson BWC Part 2, Doc. 40-15 at 08:59:00-08:59:20.)  That is, there was a meaningful temporal gap between Officer Tait's commands and Mrs. and Mr. Smith's exit from the residence.

This poses a problem for Plaintiffs, because for a show-of-authority seizure to occur, "it must be the official show of authority that produces the suspect's acquiescence." *United States v. Baxter*, 12 F. App'x 170, 172 (4th Cir. 2001); *see also Hodari D.*, 499 U.S. at 628 (explaining that officers' use of flashing lights during a police chase could not have effected a seizure because "that 'show of authority' *did not produce* [the plaintiff's] stop" (emphasis added)); *Hill v. City of Fountain Valley*, 70 F.4th 507, 514 (9th Cir. 2023) ("[T]he officer's show of authority must cause the plaintiff's submission.").  The delay between the issuance of Officer Tait's instructions and Plaintiffs' exit

from the home undercuts Plaintiffs' assertion that they were prompted to leave their home by Officer Tait's commands.  Indeed, the Eleventh Circuit has explained that "for a show-of-authority seizure to occur, ordinarily a suspect must submit *immediately* upon that showing to demonstrate he yields." *Watkins v. Davis*, 156 F.4th 1084, 1104 (11th Cir. 2025) (emphasis added). Here, Plaintiffs did not submit to Officer Tait's directions to exit their home promptly; they waited over half an hour to come outside.

In addition, two intervening phone calls, involving much discussion between Officer Tait, Sergeant Wilson, and Mrs. Smith, occurred between the time Officer Tait commanded Plaintiffs to leave and Plaintiffs' actual exit from the house.  During those conversations, Sergeant Wilson repeatedly emphasized to Mrs. Smith that he was "not talking about arresting anyone" and was "not trying to arrest anyone."  (Tait BWC, Doc. 40-13 at 08:43:20-08:45:10.)  Sergeant Wilson reassured Mrs. Smith twice that she was not facing any criminal charges.  (*Id.*)  He also employed language that could be viewed as indicating that Plaintiffs were free to deny officers' requests to come out of the house and talk to them.  For example, Sergeant Wilson asked Mrs. Smith: "*Are you willing* to come to the steps and sit down on your front steps and talk

to me?" (*Id.* (emphasis added).)[9]  In common parlance, one might characterize Sergeant Wilson's intervention as an effort to significantly "deescalate" the situation.

Based on the Eleventh Circuit's guidance that "ordinarily a suspect must submit *immediately* upon [a show of authority] to demonstrate he yields[,]" *Watkins*, 156 F.4th at 1104 (emphasis added), the Court finds that Plaintiffs did not submit to Officer Tait's commands to come out of their home.  Or put another way, Officer Tait's orders were not the only show of authority that prompted Plaintiffs to leave their home.  Given the half-an-hour delay between Officer Tait's instructions and Plaintiffs' exit from the residence, as well as the intervening phone calls between Mrs. Smith and the officers, Plaintiffs did not

---

[9] There is also at least some indication that Mrs. Smith may have understood the encounter to have changed to a consensual one.  At the end of the first call with officers—following Sergeant Wilson's reassurances that he did not want to arrest anyone and that Mrs. Smith was not facing any charges—Mrs. Smith appeared to exert some control over the interaction with officers.  She told officers that she was going to come outside or that officers could come in the house in 10 minutes.  She then instructed Sergeant Wilson to "[c]all [her] in exactly 10 minutes and then we'll resolve it."  (Tait BWC, Doc. 40-13 at 08:43:20-08:45:10.)    That said, Mrs. Smith's subjective perception is not relevant to the seizure inquiry.  *See Hodari D.*, 499 U.S. at 628 ("[T]he test for existence of a 'show of authority' is an *objective* one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." (emphasis added)).

"actually submit[ ]" to Officer Tait's initial show of authority. *Brendlin*, 551 U.S. at 254.

That finding, however, also does not end the seizure inquiry in this case. Even though Plaintiffs did not yield to Officer Tait's *initial* show of authority, the Court finds that Officer Tait, along with other officers, engaged in a *continued* show of authority to which Plaintiffs Catherine and Dwight Smith submitted by exiting their home. Put another way, when considering the totality of the circumstances *at the time that Mrs. and Mr. Smith exited their home*, a reasonable person would not have felt free to ignore the officers' repeated demands and (later) requests that Plaintiffs come outside and speak with them. In reaching this conclusion, the Court considers five factors especially significant.

*First*, despite the passage of time following their initial commands, Officer Tait and other officers remained outside Plaintiffs' home. Moreover, they provided no indication that they planned on leaving until Plaintiffs exited their home to speak with them. Although factually distinct, in *Menuel*, the Eleventh Circuit characterized police officers' encirclement of a suspect barricaded in a bedroom as an "impenetrable deployment of police compulsion" and an "overwhelming" display of "force." *Menuel*, 25 F.3d at 995; *see United States v. Jerez*, 108 F.3d 684, 692 (7th Cir. 1997) ("When a person is in a

38

confined area, encircling the area in an intimidating fashion contributes to a reasonable belief that ignoring the law enforcement presence is not an option."); *c.f. Baude v. Leyshock*, 23 F.4th 1065, 1071 (8th Cir. 2022) ("When a person is surrounded by officers on all sides, he would reasonably believe that he is no longer free to leave and that he has been seized."). Here, the BWC footage shows that officers used their police vehicles to block off the cul-de-sac on which Plaintiffs' house sat.

*Second*, and relatedly, it is significant that this incident took place outside Plaintiffs' *home*, which is an especially sensitive location for Fourth Amendment purposes. One throughline in the Supreme Court's Fourth Amendment jurisprudence is the sanctity of the home. That is, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). And although not the only factor, "[w]here" a police encounter "takes place" is certainly a consideration in a seizure inquiry. *Bostick*, 501 U.S. at 437.

*Third*, notwithstanding Sergeant Wilson's efforts to reassure Mrs. Smith that he did not intend to arrest Plaintiffs, the officers continued to request that Mrs. Smith leave her house and talk to them. Sergeant Wilson, for instance,

repeatedly told Mrs. Smith he "want[ed] to sit down and talk" with her. (Tait BWC, Doc. 40-13 at 08:43:20-08:45:10.)    As the Eleventh Circuit has recognized, "when the police state that they 'want to' undertake some activity, agreement to such an imperative statement is often seen as submission to a claim of authority[.]" *United States v. Gonzalez*, 71 F.3d 819, 829 (11th Cir. 1996) (citing 3 Wayne R. LaFave, *Search and Seizure—A Treatise on the Fourth Amendment* § 8.2(a) at 180 (1987)).

Throughout the incident, moreover, Mrs. Smith protested the officers' presence outside their home.    Officers responded to those protests by repeatedly requesting that Mrs. Smith come outside of her house.    On her second and final phone call with officers, three minutes before she exited the residence, Mrs. Smith told Sergeant Wilson, "I'm not even sure if I want to talk to you now."  (Tait BWC, Doc. 40-13 at 08:54:55-08:57:00.)  Sergeant Wilson did not inform Mrs. Smith that she was free to ignore his request to speak, but instead asked, "So are you interested in resolving the issues?"  (*Id.*)  A few moments later, Sergeant Wilson stated, "I'm asking you to meet me on the front porch."   (*Id.*)    Even though Sergeant Wilson's language was polite, the consistent and repeated nature of the officers' requests indicated that Plaintiffs would not be left alone until they complied with the requests.  *C.f. United States v. Jones*, 678 F.3d 293, 303 (4th Cir. 2012) ("A request certainly is not

an order, but a request—two back-to-back requests in this case—that conveys the requisite show of authority may be enough to make a reasonable person feel that he would not be free to leave" (quotation omitted)); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (finding that an officer's instruction to "just hang out right here for me" was sufficient to effectuate a seizure notwithstanding the fact that the officer "did not display an intimidating demeanor or use coercive language"); *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (finding that a suspect was seized when he attempted to decline an officer's initial request to roll down his window, but the officer made the same request again, making it clear that he "would not be left alone until he complied").

*Fourth*, although Plaintiffs did not comply with Officer Tait's initial instructions to exit the home, those earlier orders are still relevant to the totality of circumstances at the time Plaintiffs exited their home. A reasonable person's perception of whether they were free to ignore officers' subsequent requests would nevertheless be informed by the officers' earlier commands to come out of the residence. It is worth again emphasizing the volume and unequivocal nature of these commands. Officer Tait declared that Plaintiffs were under arrest and ordered them out of their home no less than 15 times at the beginning of the encounter. Two separate 911 operators also informed

41

Plaintiffs in no uncertain terms that if they didn't leave their house, officers would enter their home and arrest them. Sergeant Wilson then sought to deescalate the situation, but those initial commands make it more likely that a reasonable person would not feel at liberty to ignore officers' later requests to exit the home.

*Fifth*, when Plaintiffs exited the front door of their home, they were almost immediately joined by several officers, including Officer Tait, on their driveway. At the end of her second call with the officers, Mrs. Smith expressed her desire to leave the house, stating: "I'm getting ready to leave now, in fact. I'm just going to leave. Outside the house. I'm going to pull my car out in about three minutes." The conversation took place on Officer Tait's phone, and he heard the conversation. (Tait BWC, Doc. 40-13 at 08:54:55-08:57:00.) When Plaintiffs exited their home, Officer Tait and Sergeant Wilson stepped onto their driveway and physically blocked, albeit briefly, their ability to leave. Officer Ehrenreich also approached and stood behind Officer Tait and Sergeant Wilson on the edge of the driveway. Another police official, Major Clifton, is also seen standing on the edge of the driveway. (Ehrenreich BWC, Doc. 40-12 at 09:00:20-09:00:55; Wilson BWC Part 2, Doc. 40-15 at 09:00:20-09:00:55.)

42



(Ehrenreich BWC, Doc. 40-12 at 08:59:29.)

Though the officers quickly left the driveway when Mrs. Smith demanded they leave,[10] the Court still considers the officers' approach on the driveway as a factor weighing in favor of finding a seizure. As the Eleventh Circuit has noted in the context of airport stops, "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance" with respect to whether a seizure has occurred. *United States v. Berry*, 670 F.2d 583, 597 (5th

---

[10] Officer Tait left the driveway especially quickly in response to Mrs. Smith's demand that he do so. In total, Officer Tait stood on Plaintiffs' driveway for approximately 30 seconds. (Ehrenreich BWC, Doc. 40-12 at 08:59:15-08:59:45.)

Cir. 1982); *see Andre*, 148 F.4th at 1293; *see also Keller v. Fleming*, 952 F.3d 216, 223 (5th Cir. 2020) ("Officer Hawthorne interrupted Simpson's path and intercepted him to prevent his progress—which is probably decisive in assessing seizure." (cleaned up)).  The Court does not see why officers' physical obstruction of Plaintiffs should be any less significant here.  To the contrary, the driveway adjacent to Plaintiffs' home, even if it does not constitute curtilage, is more sensitive from a Fourth Amendment perspective than public places like airports.  *C.f. Jardines*, 569 U.S. at 6 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."); *Andre*, 148 F.4th at 1293 (noting that an airport, unlike a home, "is outside the realm of Fourth Amendment protection" (cleaned up)).

In short, after having their home surrounded by police officers for forty-five minutes, and facing repeated demands and requests to come outside, a reasonable person in Plaintiffs' position would not have felt free to ignore the officers' presence.  Moreover, upon exiting the house, Plaintiffs were blocked by officers, albeit briefly, on their driveway.  When considered together, Officer Tait's and other officers' actions "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quoting *Chesternut,* 486 U.S. at 569).  Further, by complying with officers' later requests to exit their home and speak with

officers on the driveway, Mrs. and Mr. Smith "voluntary submi[tted] to a show of authority[.]" *Torres*, 592 U.S. at 322.

Based on the totality of the circumstances, the Court concludes that Officer Tait and other officers seized Mrs. and Mr. Smith for Fourth Amendment purposes when they exited their home. Officer Tait does not argue that he had a warrant or probable cause justifying his seizure of Plaintiffs, or that the seizure was otherwise reasonable. In the absence of briefing on the reasonableness of the seizure, the Court assumes for argument's sake, and without deciding, that the seizure violated the Fourth Amendment.

## 2. Clearly Established Law

The Court must now determine whether Officer Tait violated "clearly established law" in seizing Mrs. and Mr. Smith. "An official's conduct violates clearly established law when 'the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Echols v. Lawton*, 913 F.3d 1313, 1323 (11th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). There are three ways in which a plaintiff can demonstrate that the law is clearly established: (1) "showing that a materially similar case has already been decided, whose facts are similar enough to give the police notice; (2) showing that a broader, clearly established principle derived from general statements of the law contained

45

within the Constitution, statute, or caselaw should control the novel facts of his case; or (3) showing that the officer's conduct so obviously violates the Constitution that prior case law is unnecessary." *Andre*, 148 F.4th at 1298 (quoting *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023)) (cleaned up).

For a legal rule to be clearly established, "[t]he rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 63-64 (quotation omitted). "Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up).

The Court first observes that the Eleventh Circuit has applied the clearly established law inquiry to the threshold question of whether an officer's actions amounted to a seizure of a plaintiff. *See, e.g., Andre*, 148 F.4th at 1299 (affirming a grant of qualified immunity where it was not clearly established

46

that officers' actions would have amounted to a seizure under controlling precedent); *Cooper v. Rutherford*, 503 F. App'x 672, 675-76 (11th Cir. 2012) ("[P]reexisting case law does not clearly establish that Appellees were seized when Officer Black's bullet accidentally struck them during the confrontation with the armed bank robber.").

Plaintiffs have not identified any Supreme Court or Eleventh Circuit case that considers whether a seizure occurred under facts materially similar to those present here.  For example, Plaintiffs cite *United States v. Edmondson*, 791 F.2d 1512 (11th Cir. 1986), contending that "[i]t was clearly established that the officers unreasonably terminated the freedom of the Plaintiffs while barricaded in their home."  (Doc. 48 at 13.)  *Edmondson*, however, did not consider whether a person was seized when their house was surrounded by police.  Instead, in *Edmondson*, the Eleventh Circuit held only that "[a] suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority."  *Id.* at 1515.[11]  Another case cited by Plaintiffs, *Moore v. Pederson*, determined that an officer made an unlawful seizure by breaching the threshold of the plaintiff's

---

[11] Similarly, *United States v. Tovar-Rico*, also cited in Plaintiffs' briefing, concerned whether the police obtained consent to make a warrantless entry into a suspect's home.  61 F.3d 1529 (11th Cir. 1995).

home to arrest him where the officer lacked a warrant, probable cause, exigent circumstances, or consent.  806 F.3d 1036, 1044 (11th Cir. 2015).

None of the cases cited by Plaintiffs, which involve warrantless entries, searches, and arrests within the home, consider the question of whether a seizure occurred under facts like those present here.  Nor has the Court been able to independently locate such a case.  Therefore, the Court considers whether "a broader, clearly established principle derived from general statements of the law . . . should control the novel facts of his case[.]"  *Andre*, 148 F.4th at 1298.

In the Court's view, existing caselaw did not provide "sufficiently clear" notice such that "every reasonable official [in Officer Tait's position] would understand" that his actions amounted to a seizure of Mr. and Mrs. Smith. *Wesby*, 583 U.S. at 63 (quotation omitted).  The relevant legal test for whether an officer has engaged in a show of authority sufficient to give rise to a seizure is broad and fact-intensive—namely, "whether the officer's words and actions would have conveyed . . . to a reasonable person" that "he was being ordered to restrict his movement[.]"  *Hodari*, 499 U.S. at 628.  Or whether, in light of an officer's words and actions, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."  *Bostick*, 501 U.S. at 436.

Although there are several cases specifying the factors that should be considered in determining whether a seizure occurred, those cases do not prescribe *how* those factors should apply to every factual scenario. *See, e.g.*, *Mendenhall*, 446 U.S. at 554 (listing "[e]xamples of circumstances that might indicate a seizure," such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled); *Perez*, 443 F.3d at 778 (listing factors a court should consider in determining whether there was a seizure such as whether the "citizen's path is blocked or impeded, . . . the length of the suspect's detention and questioning, the number of police officers present, . . . and the language and tone of voice of the police"). While there may be many cases where the application of the relevant factors is straightforward, this case is not one of them.

As the Court explained above, it faced considerable difficulty in determining whether Officer Tait seized Plaintiffs under the circumstances of this case for at least two reasons. First, Plaintiffs did not submit to Officer Tait's commands to exit their home with their hands up. Approximately half an hour elapsed between the time that Officer Tait issued his last order for Plaintiffs to come out of the house and the moment when Plaintiffs actually

49

left their home. Second, during this interim period, Sergeant Wilson repeatedly assured Mrs. Smith that he did not want to arrest any of the Plaintiffs and began using language indicating that he was *requesting*—rather than ordering—Mrs. Smith to exit the home to speak with officers. (*See* Tait BWC, Doc. 40-13 at 08:43:20-08:45:10 ("Are you willing to come to the steps and sit down on your front steps and talk to me?").)

Had Plaintiffs promptly yielded to Officer Tait's commands at the time they were given, the Court would have concluded that a reasonable officer in Officer Tait's position would have known that his actions amounted to a seizure. Officer Tait's initial commands were unequivocal—he repeatedly declared that Plaintiffs were under arrest and ordered Plaintiffs out of their home with their hands up. But Plaintiffs did not submit to Officer Tait's initial orders. They stayed in their home for half an hour and only came out following extensive conversations with Officer Tait and Sergeant Wilson over the phone.

Therefore, as discussed earlier, the relevant temporal point for the seizure analysis is the moment that Plaintiffs exited their home. By that time, Sergeant Wilson had undertaken significant efforts to deescalate the situation between Plaintiffs and the officers. For instance, he had repeatedly told Mrs. Smith that he had no interest in arresting any of the Plaintiffs and that she did not face any charges. And in requesting that Mrs. Smith come outside and

50

speak with him, he employed language that—at least arguably—indicated that she could deny his request. When Mrs. and Mr. Smith did eventually exit the house, the officers briefly approached them on their driveway to speak with them but quickly left when Mrs. Smith demanded they do so. Indeed, Officer Tait left especially quickly—he spent a total of 30 seconds on the driveway. The officers did not attempt to physically handcuff or restrain Plaintiffs in any manner.

While the Court has now determined that a seizure occurred based on the totality of the circumstances, a reasonable officer in Officer Tait's position could have believed otherwise. In particular, an officer could have reasonably believed that Sergeant Wilson's lengthy conversation with Mrs. Smith demonstrated that the officers no longer intended to seize Plaintiffs and wished only to have a consensual conversation with them. Moreover, the Court considers it significant that while Officer Tait briefly approached Plaintiffs on their driveway, he left almost immediately upon Mrs. Smith's request that he do so. Plaintiffs have not pointed to—nor has the Court been able to locate— any case law placing the question of whether Officer Tait's actions constituted a seizure "beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). To the

51

contrary, the prolonged back-and-forth exchanges between Plaintiffs and officers in this case are especially challenging to parse from a Fourth Amendment perspective, even with the benefit of hindsight.

Because a reasonable officer in Officer Tait's position may not have understood that his actions amounted to a seizure under the peculiar circumstances of this case, the Court finds that the relevant law was not clearly established. As such, Officer Tait is entitled to qualified immunity with respect to Plaintiffs' unlawful seizure claim.[12]

### B. Unlawful Search (Count 1)

Plaintiffs argue that Officer Tait unlawfully intruded onto the curtilage of Plaintiffs' home. (*See, e.g.*, Doc. 40-1 at 6 ("Plaintiffs did not give Defendant Tait an expressed license to intrude onto the Plaintiff's curtilage.").) Elsewhere, Plaintiffs contend that Officer Tait "intruded on the Plaintiffs privacy [by] using a PA loud microphone for 8 minutes calling for arrest and issuing verbal command[.]" (Doc. 48 at 5.) Plaintiffs suggest that, pursuant *Kyllo v. United States*, 533 U.S. 27 (2001), Officer Tait may have unlawfully searched their home without physically trespassing on their property. (Doc.

---

[12] Even if were clearly established that Plaintiffs were seized for the purposes of the Fourth Amendment, the Court is unaware of any case that clearly establishes that Officer Tait's actions were constitutionally unreasonable, when viewed under the totality of the circumstances presented here.

48 at 4.)  Based on the evidence submitted by Plaintiffs, the Court finds that Officer Tait did not search Plaintiffs' home or its curtilage.

The Fourth Amendment's "constitutional protection of people in their houses extends to the 'curtilage' of the home, which is 'the area immediately surrounding and associated with the home.'" *United States v. Stephen*, 823 F. App'x 751, 754 (11th Cir. 2020) (quoting *Collins v. Virginia*, 584 U.S. 586, 586 (2018)).  "[I]t is 'presumptively unreasonable' to search a home or its curtilage without a warrant[.]" *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)).  The question of whether a particular area constitutes curtilage is "resolved with particular reference to four factors: [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

When Officer Tait arrived at the scene of the incident, he positioned himself and his police vehicle on the road outside of Plaintiffs' residence.  This road—whether it was a public or private road—was not part of the curtilage of Plaintiffs' residence.  The officers' BWC footage demonstrates that the road was separated from Plaintiffs' home by a driveway.  The road was not enclosed

54

and was, at minimum, accessible to neighbors and their visitors, if not the general public. There is also no indication that Plaintiffs—pretermitting whether they even had the authority to do so—took any steps to shield the road from public view.

The only time that Officer Tait arguably entered the curtilage of Plaintiffs' home was when he briefly stood on Plaintiffs' driveway while speaking to them. Sergeant Wilson's body camera footage depicts Officer Tait's location at the time he spoke to Plaintiffs.



(Wilson BWC Part 2, Doc. 40-15 at 08:59:19.)

The portion of the driveway on which Officer Tait was standing is similar to the section of driveway that the Eleventh Circuit considered in *United States v. Stephen*, 823 F. App'x 751 (11th Cir. 2020). In *Stephen*, the Eleventh Circuit recognized that the relevant driveway area was near the defendant's house, but nevertheless determined that the driveway was not part of the curtilage of the house:

> The driveway was not gated, covered, enclosed, or partly enclosed. It did not appear that any portion of the driveway was used as a porch or patio or otherwise served as an extension of Stephen's home—to the contrary, the driveway appeared to be a common area used by the residents of both units solely for parking cars. And the occupants of the home had made no effort to conceal the driveway from passersby. Furthermore, the driveway formed part of the path that visitors would naturally take to walk to the front door—a pathway led from the upper end of the driveway to the front porch. In short, nothing in the record indicates that the deputies entered an area harboring the "intimate activity associated with the sanctity of a man's home and the privacies of life" when they approached Stephen in his driveway.

*Id.* at 755.

Likewise, applying the *Dunn* factors here, the Court finds that the portion of the driveway on which Officer Tait was standing did not constitute the curtilage of the home. Plaintiffs' driveway appears to be relatively short, approximately three car lengths long. Thus, the relevant area of the driveway was quite close to the garage attached to Plaintiffs' home. This factor weighs in favor of classifying the subject portion of the driveway as curtilage.

However, the remaining *Dunn* factors do not support the argument that the relevant area of the driveway was curtilage. "The driveway was not gated, covered, enclosed, or partly enclosed." *Stephen*, 823 F. App'x at 755. Further, it does "not appear that any portion of the driveway was used as a porch or patio or otherwise served as an extension of [Plaintiffs'] home[.]" *Id.* Instead, the presence of Plaintiffs' vehicle suggests that the driveway was used to park vehicles. There is no furniture or other indication that the driveway was employed as a patio or other intimate area of the home. It is also clear that Plaintiffs "made no effort to conceal the driveway from passersby." *Id.* To the contrary, the driveway was visible from the road, as well as from the homes of Plaintiffs' neighbors. The Court also considers that "the driveway formed part of the path that visitors would naturally take to walk to the front door[.]" *Id.* The portion of the driveway at issue is connected to a footpath that leads visitors to the front door of the residence.

Considering the *Dunn* factors together, the area in which Officer Tait briefly stood was not one that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn*, 480 U.S. at 300 (cleaned up). Because Officer Tait did not enter the curtilage of Plaintiffs' home, he did not require a warrant to approach them and speak to them.

Further, to the extent that Plaintiffs argue that Officer Tait searched their home without entering it, *à la Kyllo*, there is simply no support for that proposition.  Plaintiffs do not show that Officer Tait used a thermal imager, or any other device not in general public use.  Nor do Plaintiffs indicate that Officer Tait evinced any intent to search their home.  Plaintiffs therefore cannot bring a Fourth Amendment claim against Defendant Tait for conducting an unlawful search of their home.

**C. Excessive Force (Count 2)**

Plaintiffs contend that Officer Tait used excessive force against them in violation of the Fourth Amendment.  (Doc. 40-1 at 15.)  Specifically, Plaintiffs allege that Officer Tait used excessive force

> based on [extreme coercion (1) Terminated the Plaintiffs freedom for over 47 minutes in broad daylight (2) no crime had been committed, (2) the Plaintiffs never posed a threat to the safety of the officers or others (3) the officers called for arrest using a PA loud microph[on]e in a threatening manner invading the Plaintiffs privacy (4) Used marked police cars to block off the Plaintiffs home (5) Defendant did not probable cause and exigent circumstances to effect the arrest while the Plaintiffs were barricaded inside of their home.

(Doc. 40-1 at 18-19.)  Plaintiffs also state that Officer Tait "intentionally placed the Plaintiffs in immediate apprehension of harmful or offensive contact by order the plaintiffs out of the home they are under arrest."  (Doc. 48 at 16.)

57

"To assert a Fourth Amendment claim based on the use of excessive force," a plaintiff "must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable." *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1166 (11th Cir. 2005). As the Court held with respect to Plaintiffs' unlawful seizure claim, it was not clearly established that Officer Tait's actions constituted a seizure under the circumstances present here. For that reason, Officer Tait is also entitled to qualified immunity on Plaintiffs' excessive force claim. Even if that were not the case, there is simply no indication that Officer Tait employed any force in briefly approaching Plaintiffs on their driveway or at any other time. Plaintiffs have not submitted evidence showing that Officer Tait applied physical force to them in any manner. Moreover, while other officers brandished firearms in a low-ready position outside of Plaintiffs' home, the BWC footage does not depict Officer Tait doing so. On this record, Plaintiffs cannot state an excessive force claim against Officer Tait.

### D. First Amendment Retaliation (Count 3)

Plaintiffs allege that Officer Tait retaliated against them for exercising their First Amendment rights. (Doc. 28 ¶¶ 227-235.) In their response brief, they claim that "the retaliatory conduct is an arrest." (Doc. 48 at 18.) The First Amendment "protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."

58

*Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019) (quotation marks omitted).  To prevail on a claim for First Amendment retaliation, a plaintiff must show that (1) he engaged in protected speech, (2) the official's conduct adversely affected the protected speech, and (3) a causal connection existed between the speech and the official's retaliatory conduct.  *Id.*

Plaintiffs have not alleged sufficient facts, or presented evidence, supporting a First Amendment retaliation claim against Officer Tait.  As an initial matter, Plaintiffs do not specify what protected speech they engaged in that purportedly prompted retaliation from Officer Tait.  Moreover, even assuming that Officer Tait's announcements that Plaintiffs were under arrest and demanding that they exit their home were unlawful, the record does not indicate any causal connection between Plaintiffs' speech and Officer Tait's actions.  Officer Tait began issuing those commands within approximately one minute of arriving on the scene.  He had not spoken to Plaintiffs or heard their speech at that juncture.  Based on the circumstances, Officer Tait's announcements appear to have been motivated by Officer Ehrenreich's report that Plaintiffs attempted to "charge" at Officer Ehrenreich.

In short, Plaintiffs have failed to plausibly establish any element of their First Amendment retaliation claim against Defendant Tait.

## E. Failure to Intervene (Count 4)

Plaintiffs contend that Officer Tait is liable for failing to intervene in other officers' use of excessive force against them.  (Doc. 48 at 19-20.)  "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)). To bring a failure to intervene claim, "there also must be an underlying constitutional violation."  *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019).

As explained in preceding sections of this order, it was not clearly established that the officers' actions amounted to a seizure under the facts of this case.  For that reason, Officer Tait is also entitled to qualified immunity on Plaintiffs' failure to intervene claim.

Further, the only act of excessive force that Plaintiffs contend that Officer Tait should have intervened in is Officer Ehrenreich's act of "holding a rifle with his hands on the trigger in front of the Plaintiffs home."  (Doc. 48 at 20.)  Plaintiffs have not identified any case where a court has held an officer liable for failing to prevent another officer from holding a weapon in the low ready position, especially where, as here, the officer was told that people had

60

attempted to attack the other officer.  Qualified immunity would therefore be appropriate on this ground as well.

### F. Civil Conspiracy (Count 5)

Plaintiffs allege civil conspiracy claims against Officer Tait pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1986.  (Doc. 28 ¶¶ 245-251.) To prevail on a claim for civil conspiracy under 42 U.S.C. § 1985(3),[13] a plaintiff must establish:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Park v. City of Atlanta*, 120 F.3d 1157, 1161 (11th Cir. 1997).

42 U.S.C. § 1986 "provides a cause of action against anyone who has 'knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so

---

[13] Although Plaintiffs do not specify which subsection of 42 U.S.C. § 1985 they assert their claim under, § 1985(3) is the only subsection that could apply to their allegations.  Subsection (3) concerns the deprivation of civil rights or privileges, while subsection (1) involves the prevention of federal officers from performing their duties and subsection (2) prohibits the obstruction of justice in various ways.  42 U.S.C. § 1985.

to do.'" *Id.* at 1159 (quoting 42 U.S.C. § 1986).  In other words, Section 1986 claims are "derivative" of Section 1985 violations.  *Id.*

Officer Tait argues that Plaintiffs' conspiracy claims are precluded by the "intracorporate conspiracy doctrine." (Doc. 44-1 at 14-15.)  Plaintiffs do not respond to this argument.  "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). Pursuant to the doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *Id.*  The Eleventh Circuit has interpreted the intracorporate conspiracy doctrine to bar—subject to certain exceptions not applicable here—Section 1985(3) claims "against actors who are part of a single, public entity and who allegedly conspired to interfere with civil rights." *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 768 (11th Cir. 2000).

In this case, Plaintiffs allege a conspiracy between the individual Defendant officers, all of whom were officers at the City of John's Creek Police Department.  (Doc. 28 ¶¶ 245-251.)  That is, all the officers were employed by the same municipal entity.  As such, the intracorporate conspiracy doctrine precludes Plaintiffs from bringing a Section 1985(3) claim against Defendant

Tait and the other officers. *See Dickerson*, 200 F.3d at 768 ("[T]he County jail and its employees are considered to constitute a single legal entity that cannot conspire with itself."). Moreover, because Plaintiffs cannot show the existence of a conspiracy under Section 1985(3), Plaintiff also cannot assert a derivative Section 1986 claim. Plaintiffs Section 1985 and Section 1986 civil conspiracy claims are therefore dismissed.

**G. State Law Claims for Trespass and Assault (Counts 7 & 8)**

Plaintiffs allege state law claims for trespass and assault against Officer Tait. (Doc. 28 ¶¶ 262-73.) Officer Tait argues that he is entitled to official immunity, and that in any event, Plaintiffs have not raised a genuine dispute of material fact as to whether he committed those state law torts. (Doc. 44-1 at 17-20.)

"In Georgia, a government official 'may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.'" *Hardigree v. Lofton*, 992 F.3d 1216, 1233 (11th Cir. 2021) (quoting Ga. Const. art. 1, § 2, ¶ IX(d)). There is no dispute that Officer Tait was performing discretionary official duties when he responded to Officer Ehrenreich's call for assistance and interacted with Plaintiffs. Indeed, Plaintiffs allege that Officer Tait "was acting under the color of the law in the course and scope of his employment" as "a law

enforcement officer for the City of Johns Creek" during the events that are the subject of this suit. (Doc. 28 ¶ 11.) The question is whether Plaintiffs have presented evidence that Officer Tait acted with "actual malice" or "actual intent to cause injury" such that he does not enjoy official immunity.

"[I]n the context of official immunity, 'actual malice' requires a deliberate intention to do wrong," . . . and denotes express malice or malice in fact." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999) (cleaned up). "Actual malice is a demanding standard[.]" *Black v. Wigington,* 811 F.3d 1259, 1266 (11th Cir. 2016). "[U]nreasonable conduct" or "[e]ven recklessly illegal conduct does not support an inference of actual malice." *Id.* Further, "actual intent to cause injury" is defined as "an actual intent to cause harm to the plaintiff, 'not merely an intent to do the act purportedly resulting in the claimed injury.'" *Kidd*, 518 S.E.2d at 125 (Ga. 1999) (quoting *Frame v. Boatmen's Bank*, 782 S.W.2d 117, 121 (Mo. Ct. App. 1989)). "'Actual intent to cause injury' is also a demanding standard." *Felio v. Hyatt*, 639 F. App'x 604, 612 (11th Cir. 2016).

Plaintiffs have presented no evidence that raises a genuine dispute of material fact as to whether Officer Tait harbored actual malice or actual intent to cause injury to them. During the incident, Officer Tait did not apply *any* physical force to Plaintiffs. Nor did he point a weapon at Plaintiffs. Although he told Plaintiffs that they were under arrest and ordered them to come out of

their home with their hands up, that conduct, even if unlawful, does not indicate actual malice or an actual intent to cause injury. *See Black*, 811 F.3d at 1266 (explaining that deputies' unlawful entry into a trailer home may have been "'misguided' or even 'reckless,' but that kind of conduct does not give rise to an inference of actual malice under Georgia law"). There is simply no conduct in the record from which a jury could reasonably infer actual malice or actual intent to cause injury. Accordingly, Officer Tait is entitled to official immunity with respect to Plaintiffs' state law trespass and assault claims.

## V.     Conclusion

For the foregoing reasons, Defendant Tait's cross-motion for summary judgment (Doc. 44) is **GRANTED**. Plaintiffs' motion for partial summary judgment (Doc. 40) is **DENIED AS MOOT**. Defendant Tait is **DISMISSED** from the case.

**SO ORDERED**, this 21st day of April, 2026.

SARAH E. GERAGHTY
United States District Judge